United States District Court
Southern District of Texas
**ENTERED**
October 25, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 5:17-CR-578 |
| | § | |
| ARTURO BURUATO | § | |

## ORDER

Pending before the Court is Defendant's Motion to Suppress Evidence. (Dkt. No. 22). Defendant's Motion presents two issues: (1) whether Webb County Deputy Garcia had reasonable suspicion to pull Defendant over for driving in the left lane without passing, and (2) if not, whether the Court should suppress the stop and all evidence derived from it, including Defendant's confession and the material witnesses' statements, under the exclusionary rule. For the following reasons, the Court answers No to the first question and Yes to the second. Defendant's Motion to Suppress is hereby **GRANTED**.

I. FACTUAL FINDINGS

Defendant was indicted for transporting undocumented aliens. The Court has since held two evidentiary hearings on Defendant's Motion: one on September 12, 2017, and another on October 12, 2017. At the first hearing, the Parties opted to present the factual background via stipulations without calling any witnesses. The Parties, however, failed to agree to the events that took place after Defendant was pulled over for the traffic violation. The Court then required the additional hearing to remedy that factual gap. Based on the stipulations and evidence submitted at the hearings, the Court makes the following factual findings.

On July 5, 2017, at approximately 5:22 p.m., Deputy Garcia conducted a traffic stop on Defendant as he was driving a Chevrolet Tahoe in the northbound lanes of State Highway 83 South. Highway 83 South is a two-way highway. At the point of the stop, a wide median separates the northbound lanes from the southbound lanes. On the date in question, Highway 83 South was under repair; only temporary lines separated the lanes, and no shoulder lines had been painted on it. The only traffic signs on that stretch of the northbound lanes were a speed-limit sign (75 m.p.h.) and a "slower traffic keep right" sign. At the time of the stop, it was partly cloudy with good late-afternoon visibility.

Deputy Garcia has worked for the Webb County Sheriff's Office for eight years. He had spent seven years as a detention officer at the county jail, and had been on patrol for five months prior to stopping Defendant. Deputy Garcia patrols Highway 83 South approximately once or twice a week.

On July 5, Deputy Garcia was traveling southbound on Highway 83 South when he first noticed Defendant heading northbound. He did not recall what first attracted his attention to Defendant's Tahoe, but did recall that the Tahoe was preceded on the highway by another SUV. Deputy Garcia decided to turn around at a crossing point in the median to follow Defendant's Tahoe. He noticed that Defendant was traveling in the left lane and that there was no other traffic on the northbound lanes. Deputy Garcia erroneously believed that a "left lane for passing only" sign was posted on that stretch of the highway. Deputy Garcia followed Defendant for approximately 30 seconds in the passing lane and then activated his

emergency lights. Defendant immediately pulled over.

As Deputy Garcia approached the Tahoe, he noticed that Defendant wanted to exit the vehicle, so he waived him to the rear of the Tahoe. After Defendant informed Deputy Garcia that he did not have a driver's license, Deputy Garcia walked to the front of the Tahoe to ask any passengers for their identification. The front-seat passenger indicated that he lacked identification. Deputy Garcia then turned his attention to the back-seat passengers. As he did, he noticed an individual hiding between the back seats. Suspecting that the rear passengers might be undocumented aliens, Deputy Garcia signaled Deputy Zamora, who had just arrived on the scene, to handcuff Defendant and requested assistance from Border Patrol.

At approximately 5:46 p.m., Border Patrol Agent Nicholas Turner arrived on the scene. Agent Turner confirmed that all six passengers were undocumented aliens in the country illegally. Agent Turner then transported Defendant and the undocumented aliens to a Border Patrol station, where they were processed and interviewed. A little after 9:00 p.m., Defendant waived his *Miranda* rights and admitted to smuggling undocumented aliens for financial gain.

## II. ANALYSIS

"Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such

3

exception involves brief traffic stops, provided that they comport with the requirements of *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, a court must first determine if an investigatory stop is justified at its inception by reasonable suspicion of wrongdoing and then inquire into whether the officer's subsequent actions were "reasonably related in scope to either the circumstances that justified the stop or to dispelling a reasonable suspicion that developed during the stop." *United States v. Montes-Hernandez*, 350 F. App'x 862, 865 (5th Cir. 2009) (citing *United States v. Brigham*, 382 F.3d 500, 506–07 (5th Cir. 2004) (en banc)).

Here, Defendant argues that Deputy Garcia did not have reasonable suspicion to pull him over because there was no "left lane for passing only" sign on the highway. He also contends that Deputy Garcia's mistaken belief to the contrary was not reasonable.

### A. Driving in the Left Lane Without Passing

To determine the constitutionality of Defendant's traffic stop, the Court must first assess the legal status of driving in the left lane on a divided highway in Texas. The Government argues that § 545.051(a) of the Texas Transportation Code creates a baseline prohibition against driving in the left lane and that its exceptions are not relevant here. Section 545.051(a) states:

> (a) An operator on a roadway of sufficient width shall drive on the right half of the roadway, unless:
>     (1) the operator is passing another vehicle;
>     (2) an obstruction necessitates moving the vehicle left of the center of the roadway and the operator yields the right-of-way to a vehicle that:
>         (A) is moving in the proper direction on the unobstructed portion of the roadway; and

>> (B) is an immediate hazard;
> (3) the operator is on a roadway divided into three marked lanes for traffic; or
> (4) *the operator is on a roadway restricted to one-way traffic.*

TEX. TRANSP. CODE ANN. § 545.051(a) (emphasis added). If the Government's position was correct, then Deputy Garcia certainly had reasonable suspicion to pull Defendant over. But upon a plain reading of the statute, the Court must reject the Government's contention that none of the exceptions are relevant. Subsection (a)(4) states that the baseline prohibition does not apply if the driver is on a roadway restricted to one-way traffic. In this case, Defendant was on a divided highway. A large median separated the northbound and southbound lanes. Thus, the side of the roadway that Defendant was on was restricted to one-way traffic.

The Government disagrees. On its account, subsection (a)(4) only applies to streets that are fully one way—such as streets in a downtown environment—not roads that are divided by a median. While plausible, the Government's interpretation flounders in light of the Texas Court of Criminal Appeals' current interpretation of the Transportation Code, which this Court is bound to follow. *See United States v. Escalante*, 239 F.3d 678, 680 n.6 (5th Cir. 2001) ("As state courts are the ultimate authority on issues of state law, federal courts are bound by their interpretations of state law." (citing *City of Chi. V. Morales*, 527 U.S. 41, 61 (1999))).

In *Abney v. Texas*, the Texas Court of Criminal Appeals addressed whether driving in the left lane without passing on a divided highway violates the Texas Transportation Code. 394 S.W.3d 542, 548–50 (Tex. Crim. App. 2013). If the

Government's interpretation of § 545.051(a) was correct, the question presented in *Abney* could have been answered with an easy yes. Instead, the Court had to rely on a completely different provision, § 544.004(a), to resolve the issue:

> Section 544.004(a) states that an operator of a vehicle shall comply with an *applicable* official traffic control device such as a "left lane for passing only" sign. Without such a sign present within a reasonable distance of the traffic stop, there is no offense.

*Id.* at 548. It did not refer to § 545.051(a), thereby implicitly holding that it is not applicable to divided highways.

Following *Abney*, other courts have held that driving in the left lane on a divided highway is not a crime unless there is an appropriate sign nearby. *See, e.g., United States v. Castillo*, 28 F. Supp. 3d 673, 674–75 (S.D. Tex. 2014) (Costa, J.) (holding that "[t]here is no Texas traffic law specifically addressing [the legal status of driving in the left lane without passing on a divided highway]. But a traffic sign can make it a violation" to do so), *aff'd* 804 F.3d 361 (5th Cir. 2015); *United States v. Garcia*, 976 F. Supp. 2d 856, 865 (N.D. Tex. 2013) ("[D]isobeying a traffic control device, such as a 'left lane for passing only' sign, can constitute an offense but only if a driver had 'notice' of the traffic control device and failed to obey it."). Indeed, the Court could find no case where § 545.051(a) has been applied to divided highways restricted to one-way traffic. Put conversely, it has only been interpreted as a ban against driving in the oncoming-traffic lane on a two-way road. *See, e.g., United States v. Raney*, 633 F.3d 385, 390–91 (describing § 545.051(a) as a "prohibition against driving in the oncoming lane of traffic"); *Johnson v. Texas*, 365 S.W.3d 484, 489 (Tex. App.—Tyler 2012, no pet.) (applying § 545.051(a) when the defendant

6

briefly crossed over the center line into the oncoming-traffic lane).

Since § 545.051(a) does not apply to divided highways, the only provision that could justify stopping Defendant is § 544.004(a), the traffic-control-device provision. Thus, the question that the Court now turns to is whether Deputy Garcia had reasonable suspicion that Defendant had driven by a "left lane for passing only" sign within a reasonable distance of the traffic stop.

**B. Reasonable Suspicion**

For a traffic stop to be justified at its inception, the Government must prove that the stop was "supported by 'a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Castillo*, 804 F.3d 361, 364 (5th Cir. 2015) (quoting *United States v. Jordan*, 232 F.3d 447, 448 (5th Cir. 2000)). Reasonable suspicion must be supported by specific and articulable facts, not a mere hunch. *Id.* Additionally, any "reasonable suspicion cannot rest upon a mistake of law or fact unless the mistake is objectively reasonable." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015).

In this case, reasonable suspicion is entirely premised on Deputy Garcia's mistaken belief that a "left lane for passing only" sign was on the relevant section of the highway. The Government admits that no such sign exists, and it points to no other facts that could justify stopping Defendant. Thus, the Government's argument depends on whether Deputy Garcia's mistaken belief was reasonable.

Normally, mistakes of fact that justify a traffic stop are based on errors in an officer's perception of a physical fact that he observed. For example, in *United*

7

*States v. Montes-Hernandez*, the Fifth Circuit upheld a traffic stop based on the officer's belief that the license-plate frame obscured one-half of the issuing state's name, even though it actually obscured just less than half. 350 F. App'x 862, 867–68 (5th Cir. 2009).[1] This case is different. Deputy Garcia did not make a minor error of physical perception. Instead, for reasons unknown, he held a mistaken belief—independent of anything he had observed—that a sign prohibiting driving in the left lane was nearby. The Government does not attempt to tie this mental belief to any physical facts or circumstances that would make it reasonable. For example, perhaps a sign was on the highway but was recently removed.[2] Without any such explanation, however, the Court cannot uphold the stop.

A similar situation occurred in *Alvarado-Zarza*. There, the officer conclusorily stated that he thought the defendant had not signaled for 100 feet prior

---

[1] Other courts have reached similar conclusions. *See United States v. Payne*, 534 F.3d 948, 951–52 (8th Cir. 2008) (upholding a traffic stop based upon the officer's mistaken belief that the vehicle lacked a front license plate because of lighting conditions making the plate difficult to see); *United States v. Jenkins*, 452 F.3d 207, 212–13 & n.6 (2d Cir. 2006) (upholding a traffic stop based upon an absence of a license plate, even though the vehicle had an inconspicuous temporary plate); *United States v. Cashman*, 216 F.3d 582, 586–87 (7th Cir. 2000) (upholding a traffic stop based upon a "substantial" crack in the windshield, even though the crack may have "stopped just shy of the threshold for 'excessive' cracking or damage" under state law and concluding that a passing officer could reasonably conclude that the cracked windshield violated the law); *United States v. Moody*, 240 F. App'x 858, 858–59 (11th Cir. 2007) (finding reasonable suspicion that defendant's windows were too darkly tinted, even though the extent of the tinting did not in fact constitute a violation); *United States v. Jones*, Crim. Act. No. L-12-10, 2012 WL 1309837, at *6 (S.D. Tex. Apr. 16, 2012) (Marmolejo, J.) (finding an officer's misreading of a letter "I" for a number "1" to be a reasonable mistake given the lighting conditions and distance).

[2] The Government hints at something like this explanation by pointing out that the highway was under repair. The Court fails to see how construction by itself would justify Deputy Garcia's mistaken belief. Indeed, the construction zone should have snapped Deputy Garcia out of the monotony of highway travel, making it more likely that he would have noticed the traffic signs (or lack thereof) in the area. Additionally, any inference from the fact that the highway had been under repair for an unknown amount of time to the conclusion that a "left lane for passing sign" was recently removed because of the repairs is purely speculative.

to turning—when in actuality the defendant had begun to signal 300 feet before the turn. 782 F.3d at 251. The court held that without some explanation as to why the officer thought the distance was less than 100 feet, the government had not provided "the sort of specific, articulable facts which would allow a court to determine that he possessed a reasonable suspicion that [the defendant] had committed a traffic violation." *Id.* The same situation is present here. In the absence of any reasonable explanation, Deputy Garcia's conclusory statement that he thought a sign was present cannot justify reasonable suspicion.

Even if a sign were on the highway, as Deputy Garcia believed, he still would not have had reasonable suspicion to stop Defendant. Since traffic signs are meant to provide notice, it is not enough for a "left lane for passing only" sign to be present in the relevant area. Officers must also be able to point to the facts that allowed them to infer that the defendant had actually passed a sign within a reasonable distance of the stop. *Abney*, 394 S.W.3d at 549–50. Here, there is simply no evidence suggesting that Defendant had passed a relevant sign, and no reasonable explanation as to how Deputy Garcia could have mistakenly inferred otherwise.

Thus, the Court holds that because Deputy Garcia did not have reasonable suspicion to stop Defendant for driving in the left lane without passing, his stop of Defendant violated the Fourth Amendment.

### C. Exclusionary Rule

"Normally the fruits of illegal searches and seizures are not admissible in the prosecution's case in chief under the exclusionary rule." *United States v. Ramirez-*

*Lujan*, 976 F.2d 930, 932 (5th Cir. 1992). Evidence, however, can still be "admitted if it [is] derive[d] from an independent source, if the link to the illegally secured evidence is attenuated, or if it would inevitably have been discovered without the aid of the illegally obtained evidence." *United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001) (citing *United States v. Miller*, 666 F.2d 991, 995 (5th Cir. 1982)). Here, the Government argues that the link between the stop and Defendant's confession, as well as the undocumented aliens' post-arrest statements and possible future testimony, is too attenuated to justify suppression.

Just like physical evidence, verbal statements are subject to the exclusionary rule. *United States v. Hernandez*, 670 F.3d 616, 620 (5th Cir. 2012). "However, 'since the cost of excluding live-witness testimony will often be greater, a closer, more direct link between the illegality and that kind of testimony is required,'" as well as a consideration of the witness's free will. *Id.* at 620–21 (quoting *United States v. Ceccolini*, 435 U.S. 268, 277 (2012)). When the testimony is a confession, relevant factors to the free-will analysis include: the temporal proximity between the misconduct and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the officer's misconduct. *Id.* at 621.

### 1. *Defendant's Confession*

As to Defendant's confession, two of the three factors clearly weigh in favor of suppression. Only four hours separate the illegal stop from Defendant's confession. *See id.* at 623 (noting that the temporal-proximity factor weighs in favor of suppression when only a few hours passed between the relevant events). And there

are no relevant intervening circumstances of significance that would remove the taint of the unconstitutional stop. This is not a case, for example, where Defendant appeared before a magistrate after consulting an attorney, see *Johnson v. Louisiana*, 406 U.S. 356, 365 (1972), or a situation where Defendant returned to the police station several days after being released to give a voluntary confession. *See Wong Sun v. United States*, 371 U.S. 471, 491 (1963). Rather, this is a case where Defendant was stopped, searched, arrested, transported, and interviewed all within four hours and without being released. There is a direct and unbroken causal chain of events from the illegal stop to Defendant's confession.

The final factor, the purpose and flagrancy of the misconduct, cuts both ways. On the one hand, it is certainly a flagrant violation of the Fourth Amendment for an officer to conduct a traffic stop without an objective basis for doing so. On the other hand, there is no indication that Deputy Garcia acted with any subjective bad faith or had an unsavory purpose, such as using the stop as a fishing expedition for other crimes. He just mistakenly believed that a "left lane for passing only" sign was present on the highway.

In weighing all three factors in light of the exclusionary rule's purpose and its cost to the judicial system, the Court holds that Defendant's confession must be suppressed. Were it otherwise, officers—knowing that they would have the newly minted mistaken-belief card in their pocket—would be encouraged to perform illegal traffic stops anytime someone is traveling in the left lane. Such an open-door policy

would be inconsistent with the exclusionary rule's purpose.[3]

In an effort to avoid this conclusion, the Government conjures up one final and novel argument for admissibility. It attempts to conceptually sever Deputy Garcia's conduct from the Border Patrol agents' involvement. It believes that because the agents had no reason to doubt that Deputy Garcia had legally pulled Defendant over and because they, themselves, committed no misconduct, their involvement somehow attenuates the taint of the unconstitutional stop. The Court must reject that argument. Not only is there no binding case law to support it, but it would give carte blanche to local police to violate the Constitution so long as they call Border Patrol or any other federal agency thereafter. The Government cannot lock arms with local actors when it benefits from their reasonable suspicion/probable cause determinations and then switch gears to an arm's-length association when the law is violated. Drawing an artificial line between them when it suits the Government is not sanctioned by the Constitution.

### 2. *The Undocumented Aliens' Statements and Future Testimony*

Much of the above attenuation analysis applies to the undocumented aliens' statements as well. One additional factor, however, is important in evaluating a

---

[3] While the exclusionary rule's purpose is often framed with a view toward deterrence, courts do look at the possible incentives that their decisions will have on law enforcement. For example, in *Brown v. Illinois*, the Supreme Court held that "[a]ny incentive to avoid Fourth Amendment violations would be eviscerated by making [*Miranda*] warnings, in effect, a 'cure all'" to any violation. 422 U.S. 590, 602 (1975); *see also United States v. Hernandez*, 670 F.3d 616, 624 (5th Cir. 2012) ("If we were to rule the statements admissible, police officers would be encouraged to perform illegal searches in hopes of finding incriminating evidence against witnesses who would, in turn, have a reduced incentive to avoid confessing."). In essence, deterrence and incentive are different paths to the same goal: ensuring that police officers follow the Constitution.

third-party witness's free will in making statements and in their possible live testimony: the likelihood that the witness would have come forward independent of the constitutional violation. *United States v. Ceccolini*, 435 U.S. 268, 276 (1978); see also *United States v. Miller*, 666 F.2d 991, 996 (5th Cir. 1982) (allowing testimony when it was "clear that all of [the] witnesses would have come forward to testify if they had known of the fraud"). This factor also weighs in favor of suppression. The undocumented aliens had an interest in being successfully smuggled. There is no reason to think they would have come forward to testify against Defendant in the absence of being pulled over on the highway. Thus, the undocumented aliens' statements and future testimony against Defendant are also suppressed.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to Suppress (Dkt. No. 22) is **GRANTED**. Any evidence of and derived from Defendant's unlawful traffic stop is hereby **SUPPRESSED**. This includes, but is not limited to, the verbal statements and testimony addressed in the preceding sections.

It is so **ORDERED**.

**SIGNED** October 25, 2017

_____
Marina Garcia Marmolejo
United States District Judge